**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROMMELL R. STOUTE-DELEON<br><br>3432 Waggoner Dr<br>Belton, TX 76513<br><br>　　　　Plaintiff,<br><br>　v.<br><br>DANIEL DRISCOLL, in his official capacity as<br>United States Secretary of Army;<br>101 Army Pentagon<br>Washington, DC 20301-1000<br><br>　　　　Defendant. | Case No.: <u>1:25-cv-02876</u><br><br>**COMPLAINT** |

## <u>INTRODUCTION</u>

1.      This is an action brought by Plaintiff Rommell R. Stoute-Deleon, a former Army

Sergeant, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, challenging a final

decision by the Army Board for the Correction of Military Records ("ABCMR"), which decides

applications on behalf of Defendant, the Secretary of the United States Army ("Army").  The

ABCMR erred when it denied Plaintiff's petition to correct his record to reflect a medical

retirement rather than a medical separation.  The ABCMR's decision was arbitrary, capricious,

and unsupported by substantial evidence.

2.      After nearly fifteen years of service, Plaintiff was referred to the Army's Disability

Evaluation System ("DES") process due to a left knee injury.

3.      Ultimately, Plaintiff was medically separated from the Army on September 29,

2016 after the Army's Physical Evaluation Board ("PEB") designated Plaintiff's knee injury as his

1

*only* unfitting condition and assigned it a rating of 10%. In making its fitness determinations, the Army failed to find Plaintiff's bilateral upper extremity carpal tunnel syndrome unfitting. Plaintiff's bilateral carpal tunnel syndrome, which was assigned a 20 percent rating by the Department of Veterans Affairs ("VA") for each wrist, contributed to his inability to perform the duties of his office, grade, rank or rating which included driving, lifting, pushing, and carrying 100 plus pounds.

4.      The PEB should have concluded that Plaintiff's bilateral carpal tunnel syndrome was an unfitting condition based on substantial evidence in the record. Had it done so, Plaintiff would have been assigned a combined disability rating surpassing the 30 percent threshold needed to qualify for a medical retirement. Instead, Plaintiff was medically separated.

5.      In May 2021, Plaintiff applied to the ABCMR to right this error and injustice, asking that his military record be corrected to reflect a medical retirement instead of a medical separation. Plaintiff asked that his bilateral carpel tunnel be found unfitting and his VA rating from the time of discharge (20 percent for each wrist) be adopted, from which a medical retirement would flow. On September 16, 2022 the ABCMR arbitrarily denied this request.

6.      The ABCMR decision adversely affected Plaintiff, and he is entitled to judicial review under the APA. 5 U.S.C. § 702. The APA authorizes this Court to set aside any agency decision that is arbitrary, capricious, unsupported by substantial evidence, or contrary to law. 5 U.S.C. § 706(2)(A). The Secretary's determination that there was no error in the Medical Evaluation Board's ("MEB") and PEB's conclusions regarding Plaintiff's bilateral carpal tunnel syndrome is arbitrary, capricious, and unsupported by substantial evidence, or otherwise not in accordance with law.

## JURISDICTION AND VENUE

7.      Jurisdiction in this Court is based on a federal question and is proper under 28 U.S.C. § 1331.  Plaintiff seeks relief under the APA, 5 U.S.C. § 701 *et seq*.  Venue is conferred on this Court under 28 U.S.C. § 1391(e)(1).

8.      Plaintiff seeks solely equitable relief, namely, an increase of his military disability rating and to be placed into medical retirement status.

## PARTIES

9.      Plaintiff Rommell R. Stoute-Deleon served in the Army from November 2001 to September 2016 when the Army honorably discharged him due to a medically unfitting condition. Plaintiff is a citizen of the United States and currently resides in Belton, Texas.  Throughout his service, Plaintiff was a member of a regular component of the armed forces entitled to basic pay, and therefore is an eligible member as required for disability retirement under the Career Compensation Act of 1949.  10 U.S.C. § 1201(a), (c).

10.     Defendant Daniel Driscoll, 101 Army Pentagon, Washington, DC 20301, is the Secretary of the Army.  The Secretary is the head of the Department of the Army, which is a branch of the Department of Defense ("DoD").  The DoD is an agency of the United States as defined by the APA, 5 U.S.C. § 701(b)(1) and for purposes of venue as described in 28 U.S.C. § 1391(e)(1).

## SUBSTANTIVE ALLEGATIONS

### Service History and Military Occupational Specialty

11.     Plaintiff began his active duty service with the Army on November 20, 2001.  He was deployed four times—once to Afghanistan (2011-2012) and three times to Iraq (2003, 2006-2007, 2008-2009).  During his almost fifteen years of service, Plaintiff received many awards and recognitions, including the Combat Action Badge.

3

12.     Plaintiff's Military Occupational Specialty ("MOS") was as a Petroleum Supply Specialist.  Plaintiff's MOS, which the MEB must use to determine whether an injury or illness is severe enough to compromise the ability of a soldier to return to full duty, was very physically demanding.

13.     The "[p]hysical requirements and standards of grade" for Plaintiff's MOS— 92F20—are explicitly outlined in the Army's MOS Book and include frequently lifting 235 pounds as part of a 2-soldier team, lifting and carrying 100 pounds, pushing and pulling 100 pounds, occasionally climbing and descending 50 feet, digging, lifting, and shoveling.

| Table 10-92F-1  20070824 Physical requirements for MOS 92F | | |
|---|---|---|
| Skill level | Task numbers | Tasks |
| 1 | 1,2,3,4,5,6,7 | 1. Frequently lifts 235 pounds 8 inches as part of a 2 soldier team (prorated at 117.5 pounds per soldier). 2. Frequently lifts 100 pounds 4 feet and carries 50 feet. 3. Frequently pushes and pulls 100 pounds 5 feet. 4. Occasionally climbs and descends 50 feet. 5. Occasionally digs, lifts, and shovels 21 pound scoops of dirt 5x5 feet while bending, stooping or kneeling. 6. Must possess normal color vision and depth perception. 7. Frequently inspects visually. 8. Frequently writes reports and compiles data. |
| 2 | 1,2,3,4,5,6,7 | |
| 3 | 7,8 | |
| 4 | 7,8 | |
| 5 | 7,8 | |

14.     Plaintiff's responsibilities included receiving and stocking bulk and package products, issuing and dispensing bulk fuels and water from storage and distribution facilities to using units, performing petroleum and water accounting duties, and operating equipment used with petroleum and water distribution systems and multiproduct pipeline systems.

15.    Plaintiff described his MOS duties as being "physically demanding, frequently requiring [him] to move and lift inventory."  Plaintiff noted that his responsibilities included "pick[ing] up heavy petroleum-related tools and equipment" which required "significant strength in [his] hands, wrists, and arms."

16.    In addition to being able to carry out the tasks identified in the Army's MOS Book, a soldier must meet the "PULHES" requirements for the assigned MOS.  PULHES  is an acronym used by the military to memorialize the service member's medical fitness with respect to the following areas: (1) Physical Capacity/Stamina; (2) Upper Extremities; (3) Lower Extremities; (4) Hearing/Ears; (5) Eyes; and (6) Psychiatric.  There are four possible numerical designations (1-4) for each factor, reflecting the functional capacity required for each particular factor for the MOS.  A "1" indicates the highest standard while a "4" represents the lowest standard.

17.    A Petroleum Supply Specialist has PULHES requirements of 211221.  Pertinent to Plaintiff's bilateral carpal tunnel syndrome is the requirement of a "1" for "upper extremities" which is defined as "no loss of digits or limitation of motion; no demonstrable abnormality; able to do hand to hand fighting."  *See Physical Profile Serial System (PULHES)*, Army-Portal (Feb. 11, 2011), https://www.army-portal.com/jobs/pulhes.html#google_vignette.

## Medical History

18.    In April 2015 Plaintiff suffered an acute injury while sprinting—a patella tendon rupture.  He underwent surgery, engaged in physical therapy, and was placed on multiple temporary physical profiles which prohibited him from running and other physical activities.

19.    In August 2015, before Plaintiff was referred to the Army's DES process for his patella tendon injury, Plaintiff saw a physician, Dr. Brooks, for his chronic bilateral wrist pain. Dr. Brooks summarized Plaintiff's complaint in the medical record: Plaintiff "has had this for a

5

while, but reports it getting worse recently.  [Plaintiff] reports decrease [sic] grip strength with prolonged use of his hands in tingling along the median nerve distribution.  [Plaintiff] reports L worse than right."  Dr. Brooks further reported that "Phalen's maneuver," a test used to diagnose carpal tunnel syndrome, "showed numbness/tingling in the median nerve distribution" of both the right and left wrists and further noted that "[w]eakness of the right wrist was observed" and "[w]eakness of the left wrist was observed."  Dr. Brooks diagnosed Plaintiff with "CARPAL TUNNEL SYNDROME BILATERAL" and referred Plaintiff to a neurologist for additional testing "given [his] decreased grip strength and atrophy."

20.      The following month, in September 2015, as referred by Dr. Brooks, Plaintiff was seen by a neurologist, Dr. LaMancusa, for his bilateral wrist pain, decreased grip strength in his hands and wrists, and atrophy of his left thumb.  Dr. LaMancusa administered a nerve conduction study which provides an objective analysis of peripheral nerve signals—abnormalities in these nerve signals reveal nerve compression or illness.  The test results were stark: "CONFIRM Moderate Right and Left Carpal Tunnel."  Dr. LaMancusa referred Plaintiff to a hand surgeon and advised him to obtain wrist splints to be worn during sleep.

21.      In March 2016, approximately seven months after Plaintiff was diagnosed with bilateral carpal tunnel, Plaintiff was referred into the Army's DES process for his continued knee limitations.  Upon his referral, Plaintiff claimed multiple other medical conditions, including his bilateral carpal tunnel.

**The Army Disability Evaluation Process**

22.      Chapter 61 of Title 10 of the United States Code establishes the process through which the Army (and other military branches) discharges disabled service members.  This Chapter authorizes the Secretaries of each military department to medically retire service members who are unfit to perform the duties of the member's office, grade, rank, or rating because of physical

disability whenever that disability is at least 30 percent under the standard schedule of rating disabilities in use by the VA at the time of determination. *See* 10 U.S.C. § 1201.

23.     Fitness is also governed by DoD instruction as well as the specific regulations of the various military departments. Department of Defense Instruction ("DoDI") 1332.18 (Aug. 5, 2014)[1] and Army Regulation AR 635-40, ¶ 4-19*d*(1)-(2) (March 20, 2012),[2] together establish the Army DES process pursuant to Chapter 61 of Title 10 of the United States Code at the time of Plaintiff's discharge.

24.     An eligible service member may be referred for evaluation when he has: (1) "one or more medical conditions that may, individually or collectively, prevent [him] from reasonably performing the duties of [his] office, grade, rank, or rating," (2) "a medical condition that represents an obvious medical risk to [his] health or to the health or safety of other members," or (3) "a medical condition that imposes unreasonable requirements on the military to maintain or protect [him]." DoDI 1332.18, App. 1 to encl. 3, ¶¶ 2(a)(1)-(3).

25.     After referral, the first step in the DES process is examination by the VA for all conditions claimed or referred. Next, an MEB reviews a servicemember's medical status and duty limitations to determine whether the service member's medical condition(s) meets medical retention standards. *See* AR 635-40, ¶ 4-10. After reviewing the service member's records, the MEB prepares a comprehensive, narrative summary of the soldier's health status. *See* AR 635-40, ¶ 4-11. The MEB's report focuses on whether or not the service member meets the retention standards set forth in Chapter 3 of AR 40-501[3] which for neurologic conditions (*e.g.*, carpal tunnel)

---

[1] References are to the 2014 version of DoD Instruction 1332.18, which was in effect in 2016.
[2] References are to the 2012 version of Army Reg. 635-40, which was in effect in 2016.
[3] Army Regulation 40-501, Chapter 3 "gives the various medical conditions and physical defects which may render a Soldier unfit for further military service." Army Regulation 40-501, *Medical Services: Standards of Medical Fitness* ¶ 3-1 (Dep't of Army Aug. 4, 2011).

provides for referral "when after adequate treatment there remains residual symptoms and impairments such as . . . weakness, paralysis, or atrophy of important muscle groups, deformity, uncoordination, tremor pain, or sensory disturbance . . . of such a degree as to significantly interfere with performance of duty." AR 40-501, ¶ 3-30*j* (August 4, 2011); *see also* AR 635-40, ¶ 4-10.

26.     "The MEB will recommend referral to a PEB those [service members] who do not meet medical retention standards." AR 635-40, ¶ 4-13(a); *see also* DoDI 1332.18, Encl. 3, ¶ 2(d). In so doing, the MEB must confirm the medical diagnosis for and document the full clinical information for any conditions that, individually or collectively, may prevent the Service member from performing the duties of his office, grade, rank, or rating. DoDI 1332.18, Encl. 3, ¶ 2(f)(2).

27.     The PEB reviews the servicemember's medical information and makes a determination of whether he or she is fit to remain in the military. "A [s]ervice member will be considered unfit when the evidence establishes that the member, due to disability, is unable to reasonably perform duties of his or her office, grade, rank, or rating, including those during a remaining period of Reserve obligation." DoDI 1332.18, App. 2, encl. 3, ¶ 2(a). Determining whether a service member can reasonably perform their duties includes consideration of whether the service member's disability prevents them from: (a) performing the common military tasks required for their office, grade, rank or rating, such as firing a weapon, performing field duty or wearing load-bearing equipment or protective gear; (b) taking a required physical fitness test; (c) deploying individually or as part of a unit to any vessel or location specified by the military; and (d) performing any specialized duties. DoDI 1332.18, App. 2, encl. 3, ¶¶ 4(a)(1)-(4).

28.     In addition, a service member may also be considered unfit when the evidence establishes that their disability: (a) "represents a decided medical risk to the health of the member or to the welfare or safety of other members"; or (b) "imposes unreasonable requirements on the

military to maintain or protect the member."  DoDI 1332.18, App. 2, encl. 3, ¶ 2(b).  More specifically, a determination of fitness by the PEB "will be made by relating the nature and degree of physical disability of the Soldier to the requirements and duties that the Soldier may reasonably be expected to perform in their primary military occupational specialty (MOS)."  AR 635-40, ¶ 4-19(d)(2).

29.    If the PEB finds a service member unfit due to service-related injuries, then it must assign a disability rating, stated as a percentage, for each unfitting condition in accordance with the Veterans Affairs Schedule for Rating Disabilities ("VASRD").  *See* 10 U.S.C. § 1216a.

30.    The rating dictates what, if any, medical retirement benefits the service member will receive post-separation.  If the PEB determines one or more of the service member's conditions are unfitting, the PEB will refer the service member's case to the VA for the assignment of a preliminary disability rating for each unfitting condition pursuant to the VASRD.  Service branches may not diverge from the VASRD except to assign a higher disability rating.  10 U.S.C. § 1216a(a)(2).  In determining the rating of a disability, "all medical conditions, whether individually or collectively, that render the member unfit to perform the duties of the member's office, grade, rank, or rating" must be considered.  *See* 10 U.S.C. § 1216a(b).  A service member who is provided a combined disability rating of 30% or higher for one or more unfitting condition(s) is eligible for a military disability retirement.  *See* 10 U.S.C. § 1201(b).

**Plaintiff Enters the DES**

31.    While Plaintiff's DES evaluation was ongoing, treatment for his carpal tunnel continued.  Because Plaintiff's neurologist, Dr. LaMancusa, relocated, Plaintiff was required to visit a general clinic for a second time to obtain a new referral to a different neurologist, which he did on April 4, 2016.  In doing so he sought continued medical care for "bilateral hand pain" and sought "a new brace for [his] hands."  The medical record from this visit notes that Plaintiff

"state[d] that [he] experiences numbness and tingling in both hands and forearms." The medical record further notes that "[Plaintiff] was previously diagnosed with Carpal Tunnel Syndrome and was being treated by Dr. [LaMancusa] who recently relocated. The [Plaintiff] requires a new referral to be seen by another Neurologist. Will place consult."

32.     Just three days later, on April 7, as part of the DES process, Plaintiff was given a series of VA Compensation & Pension ("VA C&P") examinations, both for his referred knee condition and for his claimed conditions, including his bilateral carpal tunnel.

33.     As part of the VA C&P examination, a medical examiner examined the Plaintiff's bilateral upper extremity carpal tunnel and filled out the "Wrist Conditions Disability Benefits Questionnaire." The medical examiner noted in the record:

> [L]ast year [Plaintiff] started having numbness and tingling in his bilateral hands/wrist. [Plaintiff] was sent for EMG and diagnosed with bilateral carpal tunnel syndrome . . . Says his hands still feel numb and tingle with pain especially at night. Says he has fairly constant pain and numbness in his hands and fingers.

34.     When the medical examiner asked Plaintiff to describe his functional loss, Plaintiff said, "**I cannot grip well and hang on to things in my hands unless I am looking at the hand and the object.**" The examiner indicated that there was bilateral "**evidence of pain with weight bearing**" and that "**[p]ain [was] noted on examination and causes functional loss.**" Additionally, the examiner noted that even though Plaintiff had normal range of motion, he had pain with each direction of wrist movement. Significantly, the **examiner answered "yes" to the question of whether Plaintiff's carpal tunnel "impact[ed] his ability to perform any type of occupational task**." Occupational tasks are defined in the medical record as including activities such as lifting, which is a core component of Plaintiff's MOS. The examiner further elaborated on how Plaintiff's ability to perform occupational tasks was impacted by noting Plaintiff was "**[u]nable to grip and hold onto things.**"

35.    Also, as part of the DES process the VA examiner filled out the "Peripheral Nerves Conditions" Disability Benefit Questionnaire.  The examiner noted that Plaintiff had a peripheral nerve condition or peripheral neuropathy due to his bilateral carpal tunnel syndrome diagnosis. The findings from this examination included:

- Mild "intermittent pain," paresthesias,[4] and numbness bilaterally in the upper extremities;

- "Decreased" response to sensation testing in hands and fingers bilaterally;

- Positive tests, bilaterally, for both "Phalen's sign and "Tinel's sign," two diagnostic tests for carpal tunnel;

- "Incomplete paralysis" bilaterally of the Radial Nerve;

- "Incomplete paralysis" bilaterally of the Median Nerve; and

- Existence of EMG studies from 2015 with "Abnormal" results.

The examiner concluded that the peripheral nerve condition impacted Plaintiff's ability to work because he was "**[u]nable to grip and hold things in hands for extended periods without dropping them.**"

36.    Plaintiff's condition thus directly compromised his ability to carry out duties required by his MOS such as lifting 235 pounds as part of a 2-soldier team, lifting and carrying 100 pounds, pushing and pulling 100 pounds, digging, and shoveling.

## MEB Narrative Summary & Proceedings

37.    Less than one month after Plaintiff's VA C&P examination, on May 4, 2016, the MEB physicians issued their Narrative Summary ("NARSUM"), in which they evaluated and determined which of Plaintiff's medical issues met or did not meet retention standards.

---

[4] Paresthesias is commonly known to laymen as "pins and needles."

38.    The MEB physicians determined that only Plaintiff's left patellar tendon rupture failed medical retention standards.  The MEB NARSUM "Prognosis Statement" concluded that "[b]ecause of the chronic nature of the [Plaintiff's] [l]eft patellar tendon rupture [status post] patella tendon repair and his failure to respond to long-term medical treatment, it is very unlikely that he will ever improve sufficiently to return to full duty in [his] assigned MOS of 92F Petroleum Supply Specialist or to be able to perform other common soldier tasks, including deployment."  The MEB NARSUM "Impact on Duty" section states that "[Plaintiff] cannot perform MOS duties as an 92F Petroleum Supply Specialist requiring very heavy strength demand requirement and PULHES 211221. [Plaintiff] cannot lift [greater than] 20 [pounds] as required to issue and dispense bulk fuels and water from storage and distribution facilities . . ." The MEB NARSUM further notes that "[g]iven the inability of the [Plaintiff] to comfortably and effectively perform the physical requirements of [his] MOS . . . and the fact that this condition is unlikely to improve with further military service, the undersigned respectfully submits for consideration a recommendation for permanent separation from the military."

39.    However, the MEB NARSUM concluded that Plaintiff's bilateral carpal tunnel syndrome had not precluded the satisfactory performance of his military duties and met retention standards set out in Army Regulation 40-501.  Notably, unlike with Plaintiff's patella tendon injury, where the MEB utilized the VA C&P General Medical Exam as part of the medical basis for the MEB's finding that Plaintiff's patella tendon injury failed  retention standards, the MEB was silent with regard to the VA C&P General Medical Examiner's findings related to Plaintiff's bilateral carpal tunnel syndrome such as: (1) evidence of pain with weight bearing; (2) functional loss; (3) paresthesias and numbness bilaterally in the upper extremities; and (4) inability to grip and hold onto things without dropping them.

40.    On May 5, 2016, the MEB Proceedings were issued, concluding that Plaintiff's carpal tunnel met retention standards.

## Medical History Continued

41.    The medical evidence of the limitations Plaintiff experienced due to his carpal tunnel continued to accrue after the MEB Proceedings were issued. He visited his new neurologist, Dr. Rosenbaum, just seven days later (May 12, 2016) for continued treatment. At this visit, Plaintiff reported that his pain, numbness and paresthesia, previously limited to the wrists and hands, now extended all the way to his inner arm below the elbow. Plaintiff also noted that his pain and numbness caused him to drop items and to have trouble when gripping items, bending his wrist, or doing any physical activities where hands are needed.

42.    Dr. Rosenbaum examined Plaintiff and found "[s]ensory exam abnormalities" and "[d]ecreased sensation to [pinpricks] over the bilateral forearms medially, from the wrist to below the elbow." The examination also found "reduced" strength of the upper extremities and "[d]ecreased strength" with abduction of the fifth digits bilaterally. The doctor concluded that "[Plaintiff] has bilateral carpal tunnel with progressive symptoms" and referred Plaintiff for additional Electromyography ("EMG") testing and Magnetic Resonance Imaging ("MRI") of the cervical spine to check for ulnar neuropathy because Plaintiff's examination showed "signs of possible ulnar neuropathy" and a "sensory deficit that is in the distribution of the medial cutaneous nerve of the forearm." The subsequent EMG revealed an "abnormal study indicative of mild bilateral median mononeuropathy at the wrist (Carpal Tunnel Syndrome), slightly worse on the left."

43.    Dr. Rosenbaum ordered Plaintiff bilateral wrist guards and referred him to Occupational Therapy.  On June 7, 2016, Plaintiff went to the Brace Clinic at Fort Hood to be measured and fitted for bilateral "cock-up wrist splints."

44.    On June 22, 2016, Plaintiff started occupational therapy for his bilateral wrist and hand pain, numbness, and tingling.  He complained of "[d]ifficulty and pain with . . . lifting/pushing heavy objects at work, PT pushups and pull-ups."  The report also indicated that Plaintiff's grip strength was limited by his bilateral carpal tunnel syndrome.  Testing revealed grip strength of 32 pounds and 22 pounds in his right and left hands respectively.  By comparison, a 1985 study revealed that the normal grip strength for a 36-year-old American male is 119.7 pounds on the right hand and 112.9 pounds on the left hand.  *See* V. Mathiowetz et al., *Grip and pinch strength: normative data for adults*, 66(2) ARCHIVES OF PHYSICAL MED. & REHAB. 69, 69-74 (1985).  Plaintiff's occupational therapist concluded "Yes" to the question of whether Plaintiff needed a Profile for his wrist, though the record does not reveal that one was ever created.  Plaintiff was instructed to heat his wrists, wear splints during activities and at night, and attend at least 6 sessions of iontophoresis—a process of transdermal drug delivery by use of a voltage gradient on the skin.

## **PEB Proceedings**

45.    Notwithstanding the evidence in his medical records about how carpal tunnel had limited his hand functionality, the following month, on July 5, 2016, the PEB issued its Proceedings, concluding that Plaintiff was physically unfit for only one disability – his patella condition – and recommended a medical separation rather than a medical retirement.

## **Medical History Continued**

46.    The medical evidence of the limitations Plaintiff experienced with respect to lifting, gripping, and holding objects continued to accrue after the PEB Proceedings were issued and before Plaintiff's separation.

47.    In July 2016, Plaintiff began steroid injection treatments intended to treat his bilateral wrist pain which had been unresponsive to occupational therapy, splints, NSAIDS and braces. At this appointment, Plaintiff indicated that his wrist pain was a 5 out of 10 with both rest and activity and that "lifting or touching for a long period of time makes the pain worse and nothing makes the pain better."

48.    On July 25, 2016, Plaintiff returned to his occupational therapist. While the steroid injections and "more rest breaks" helped with his pain, Plaintiff's grip strength was still very limited by his bilateral carpal tunnel syndrome. Testing revealed grip strength of 46 pounds and 35 pounds in his right and left hands respectively, far below the norm. *See* V. Mathiowetz et al., *supra*, at 69-74. Plaintiff reported experiencing numbness and tingling in both palms daily and was given a Disabilities of the Arm, Shoulder and Hand ("DASH") Work Module test which indicated mild to moderate disability. The report again concluded "Yes" to the question of whether Plaintiff needed a Profile for his wrist.

49.    On August 5, 2016, Plaintiff had a follow-up neurology appointment where it was reported that Plaintiff had been working with an Occupational Therapist and wearing wrist braces. The medical record states that limiting use of Plaintiff's hands made his pain better while twisting his wrists or lifting made his pain worse. He reported an average pain level of 5 out of 10 and, at worst, 8 out of 10. At another medical appointment earlier in August, Plaintiff described his pain to be a "throbbing and aching" sensation and he noted "pain with lifting heavy objects."

**Medical Separation & VA Ratings**

50.      Almost one year after he reported to Army physicians that he had pain that was 8 out of 10 when "lifting heavy objects," on September 29, 2016, Plaintiff was medically separated from the Army with a 10 percent disability rating for only his left knee condition.

51.      Upon his discharge, Plaintiff's VA ratings were finalized.  He received, among other ratings, and based on his April 2016 DES examinations, a combined 40 percent rating for his bilateral carpal tunnel syndrome and wrist strain due to "mild incomplete paralysis of the major extremity."  The VA noted that the "intermittent nature and affected distribution of this condition supports a mild level of nerve impairment," and referenced the medical record findings including, "full but painful motion," intermittent pain, paresthesia and numbness," "decreased [] wrist strength and [] pinch strength," "decreased sensation in the [] hand was shown," and that the "radial and median nerves were affected."

**The Army Board for Correction of Military Records Decision**

52.      In May 2021, Plaintiff applied to the ABCMR to correct his military record to reflect a medical retirement instead of a medical separation.  Plaintiff asked that his bilateral carpel tunnel be found unfitting and his VA rating from the time of discharge be adopted, from which a medical retirement would flow.  The ABCMR determined it was in the interest of justice to consider the Plaintiff's application and sought an opinion from the Army Review Boards Agency ("ARBA") Medical Advisor ("ARBA Opinion").

53.      The ARBA Opinion, which was adopted in full by the Board in a cursory "Board Discussion" section,  concluded that (1) there was no "no probative evidence that the [Plaintiff's] bilateral carpal tunnel syndrome would have failed the medical retention standards of Chapter 3, AR 40-501, and thus been subject to a finding of unfitness for continued service and compensable

16

prior to his discharge"; and (2) there was "no evidence that [bilateral carpal tunnel syndrome] prevented the applicant from being able to reasonably perform the duties of his office, grade, rank, or rating prior to his discharge."

54.     As evidence to support this conclusion, the ARBA Opinion points to the (1) MEB NARSUM; (2) Plaintiff's July 2016 steroid injection and follow up with his neurologists where he reports "things are getting better" and that Plaintiff "has been working with [occupational therapy] and wearing braces as prescribed"; and (3) to the portion of the Veterans Benefit Administration Wrist Conditions Disability Benefits Questionnaire where the examiner documented "normal strength, no muscle atrophy, no tenderness to palpation, and normal ranges of motion bilaterally."

55.     The ARBA Opinion, and thus the Board's decision adopting the ARBA Opinion, was arbitrary, capricious, contrary to law, and unsupported by substantial evidence for at least three reasons.

56.     *First*, the ARBA Opinion fails to explain its conclusion in relation to the retention standard set forth in AR 40-501 or the standard of fitness as required by DoDI 1332.18 and AR 635-40.

57.     The ARBA Opinion simply recites the retention standard set forth in Chapter 3-30*j* of AR 40-501 for neurologic conditions and concludes that "[t]here is no probative evidence this criterion was met."  Had the retention standard set forth in Chapter 3-30*j* of AR 40-501 been adequately applied, the Board would have compared the symptoms of Plaintiff's bilateral carpal tunnel to the retention standard which requires referral to the MEB when, after treatment, there remains "residual symptoms and impairments such as . . . weakness, paralysis, or atrophy of important muscle groups, deformity, uncoordination, tremor, pain, or sensory disturbance . . . of such a degree as to significantly interfere with performance of duty."  When this standard is applied

to Plaintiff's disability it is clear that the "probative evidence [of] this criterion was met."  For example, the VA's Peripheral Nerves Conditions Disability Benefit Questionnaire indicated that the Plaintiff continued to experience paresthesias, decreased response to sensation testing, positive tests for Phalen's and Tinel's sign, and incomplete paralysis bilaterally of the Radial and Median Nerve.  Moreover, Plaintiff's symptoms were recorded by an EMG study with abnormal results and the examiner concluded that Plaintiff's nerve condition impacted his ability to work because he was "[u]nable to grip and hold things in hands for extended periods without dropping them."

58.    *Second*, the ARBA Opinion deemed Plaintiff fit without "compar[ing] the nature and degree of physical disability present with the requirements" of Plaintiff's MOS.  *See* AR 635-40, ¶ 3-1.

59.    The ARBA Opinion failed to address how Plaintiff could reasonably perform a job that requires, among other things, frequently lifting 235 pounds as part of a 2-soldier team, lifting and carrying 100 pounds, pushing and pulling 100 pounds, digging, lifting, and shoveling with his bilateral carpal tunnel symptoms.  Nor did the ARBA Opinion address how Plaintiff's symptoms such as his inability to grip well, push heavy objects at work, do his PT pushups/pullups, pain with weight bearing, numbness, and paresthesia could be found consistent with a PULHES required rating of 211221, where a 1 on Upper Extremity requires no loss of digits or limitation of motion, no demonstrable abnormality, and ability to do hand to hand fighting.  *See* Physical Profile Serial System   (PULHES),   Army-Portal   (Feb.   11,   2011),   https://www.army-portal.com/jobs/pulhes.html#google_vignette.

60.    Had the ARBA Opinion undertaken the proper analysis, it would have found that Plaintiff's bilateral carpal tunnel prevented him from reasonably performing the tasks expected of his MOS.  Support for Plaintiff's inability to perform such tasks is underscored by the VA's Wrist

Conditions and Peripheral Nerves Conditions Disability Benefits Questionnaires which note Plaintiff's inability to grip and hold onto things, bilateral pain with weight bearing, the examiner's acknowledgement that Plaintiff's bilateral carpal tunnel impacts Plaintiff's ability to perform any type of occupational task, paresthesias, numbness, incomplete paralysis bilaterally of the radial and median nerves, and Plaintiff's inability to grip and hold things for extended periods. Plaintiff's in-service treatment records lend further support for the fact that Plaintiff's bilateral carpal tunnel, despite treatment with injections, physical therapy and braces, prevented reasonable performance of the duties of his office, grade, rank or rating since the records noted: pain when "lifting or touching for a long-period of time," "difficulty and pain with . . . lifting/pushing heavy objects at work," reduced grip strength bilaterally, the need for a physical profile for his wrist condition, and worsened pain with twisting his wrists or lifting. Finally, that the VA gave Plaintiff an evaluation of 20 percent for each extremity's carpal tunnel is further evidence of disability since a 20 percent rating can only be assigned for at least mild paralysis of the peripheral nerves. *See* 38 CFR § 4.124a (DC 8513).

61.    *Third*, the ARBA Opinion failed to grapple with the full medical record regarding Plaintiff's bilateral carpal tunnel.

62.    The ARBA Opinion cites to the MEB NARSUM, concluding that "[r]eview of [Plaintiff's] records [] is consistent with these findings." However, the ARBA Opinion does not address that the MEB NARSUM failed to note any portion of the VA C&P General Medical Examiner's findings related to Plaintiff's bilateral carpal tunnel syndrome. The ARBA Opinion notes Plaintiff's July 2016 appointment where it was reported that Plaintiff "underwent an injection by orthopedics [] and that this appears to have been beneficial," and it also points to Plaintiff's follow up neurology appointment that occurred in August 2016 where Plaintiff "report[ed] that

overall things are getting better - he has been working with [occupational therapy] and wearing braces as prescribed." But, the ARBA Opinion fails to address that at the same appointment where Plaintiff reported the injections and braces helped, he also reported that his pain was worsened by twisting his wrists or lifting.

63.     Further, the ARBA Opinion does not address the fact that the prohibition on Plaintiff from performing physical activity due to the profile that existed for his knee injury was likely a contributing factor to reports that he was "getting better." The ARBA Opinion also states that "on his Veterans Benefits Administration Wrist Conditions Disability Benefits Questionnaire, the examiner documented normal strength, no muscle atrophy, no tenderness to palpation, and normal ranges of motion bilaterally." However, the ARBA Opinion ignores where the same examiner indicated bilateral evidence of pain with weight bearing, pain with each direction of wrist movement, functional loss caused by pain, and impact on Plaintiff's ability to perform any type of occupational task due to being "unable to grip and hold onto things."

64.     Finally, the ARBA Opinion is **silent** with regards to the Veterans Benefits Administration Peripheral Nerves Conditions Disability Benefits Questionnaire where the examiner  noted that Plaintiff had a peripheral nerve condition due to his bilateral carpal tunnel syndrome with symptoms such as paresthesias, numbness bilaterally, decreased response to sensation testing in hands and fingers bilaterally, positive tests for both "Phalen's sign and "Tinel's sign," incomplete paralysis bilaterally of the Radial Nerve and Median Nerve, existence of EMG studies from 2015 with "Abnormal" results, and the examiner's conclusion that the peripheral nerve condition impacted Plaintiff's ability to work because he was "[u]nable to grip and hold things in hands for extended periods without dropping them."

65.     Despite the ARBA Opinion's shortcomings, the ABCMR adopted it in full and denied Plaintiff's request on June 8, 2022.

## COUNT I

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

66.     Plaintiff Rommel Stoute-Deleon hereby incorporates by reference the allegations set forth in paragraphs 1-65 above, as if fully set forth herein.

67.     The June 8, 2022, decision by the ABCMR refusing to correct Plaintiff's Army record to reflect a medical retirement is subject to judicial review as a final "agency action" under the APA. 5 U.S.C. §§ 551(13), 701, 704. Plaintiff's appeal to the ABCMR was the final administrative option available to Plaintiff for review of his disability rating.

68.     Under the APA, 5 U.S.C. § 706(2)(A), this Court is required to hold unlawful and set aside a final agency action that is arbitrary, capricious, unsupported by substantial evidence, or otherwise not in accordance with law.

69.     The ABCMR decision that Plaintiff's bilateral carpal tunnel syndrome met medical retention standards prior to his discharge, and therefore that there is no basis for adding it as an unfitting condition is arbitrary, capricious, unsupported by substantial evidence, or contrary to law, as it failed to: (1) evaluate Plaintiff's disability pursuant to the required retention and fitness standards; (2) define Plaintiff's duties when determining reasonable performance; (3) grapple with all relevant evidence, including his VA ratings; or (4) address the flaws in the ARBA Opinion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rommel Stoute-Deleon, respectfully requests the Court to:

**(A)**     Find that the ABCMR's June 8, 2022, determination was arbitrary and capricious, unsupported by substantial evidence, and contrary to law, and set it aside under 5 U.S.C. § 706(2)(A);

21

**(B)**    Order the Secretary to correct Plaintiff's military records to reflect that he has two unfitting conditions with the correlating combined disability rating, including without limitation his DD Form 214 and his retirement orders, and a permanent medical retirement;

**(C)**    Order award of all fees and costs;

**(D)**    Order such other and further relief the Court may deem just and proper.

Dated: August 26, 2025                    Respectfully submitted,

                                          */s/  Andrew Shoyer*
                                          Andrew W. Shoyer (DC Bar No. 411870)
                                          SIDLEY AUSTIN LLP
                                          1501 K St NW #600
                                          Washington, DC 20005
                                          ashoyer@sidley.com
                                          Tel: (214) 981-3300

                                          Esther Leibfarth (DC Bar No. 1016515)
                                          Rochelle Bobroff (DC Bar No. 420892)
                                          National Veterans Legal Services Program
                                          1100 Wilson Blvd. Suite 900
                                          Arlington, VA 22209
                                          esther@nvlsp.org
                                          rochelle@nvlsp.org
                                          Tel: (202) 621-5681